UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY LEON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JACOBSON TRANSPORTATION )<br>COMPANY INC., )<br>)<br>Defendant. ) | 10 C 4939<br><br>Judge George M. Marovich |

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony Leon ("Leon") has filed suit against defendant Jacobson Transportation Company, Inc. ("Jacobson"). In his complaint, Leon alleges that he suffered discrimination, harassment and retaliation on the basis of his race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Defendant moves for summary judgment. For the reasons set forth below, the Court grants defendant's motion for summary judgment.

**I.     Background**

Before the Court discusses the facts, it reiterates the importance of complying with Local Rule 56.1. Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. As the Court notes on its website, the Court enforces Local Rule 56.1 strictly. Facts that are argued but do not conform with the rule are not considered by the Court. In addition, where one party supports a fact with admissible evidence and the other party denies the fact without citation to admissible evidence, the Court deems the fact admitted. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004). Asserted "facts" not supported by deposition testimony,

documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court.

The following facts are undisputed unless otherwise noted.

Defendant Jacobson is a third-party logistics and distribution company. From 2003 to May 2007, Jacobson employed plaintiff Leon as a material handler at its warehouse in Chicago Heights, Illinois.

At Jacobson, during the relevant time period, the primary duty of material handlers was to use forklifts to retrieve and put away products in the warehouse. At the beginning of each shift, Jacobson assigned each material handler work orders, also known as "pick sheets." Each pick sheet contained instructions about the products that needed to be retrieved from racks in the warehouse and placed together on a pallet.

For the first year that Jacobson employed Leon, Leon was assigned to the day shift. During the time when Jacobson was working on the day shift, several incidents occurred that Leon was not pleased about. At the time, Jacobson was supervised by Dallas (his last name is not in the record) and Troy Adams ("Adams"). At some point in 2003, someone put graffiti in the bathroom what said either "Tony loves Dallas" or "Dallas loves Tony." Leon told his supervisor about it, but no one investigated. One time in 2004, Dallas pulled out a knife. Another time, when Leon stated that he was an African-American, Dallas told Leon that Leon was an American. At the same time, Adams called Leon an asshole.

After Leon had been working at Jacobson for about a year, he transferred to the night shift, which consisted of about six employees. Leon was the only black employee on the night shift. The night shift was supervised by Paul McKeague ("McKeague").

After Leon had been working on the night shift for about two years, he received a performance evaluation. Among other things, Leon was told he needed to improve his attitude toward his co-workers.

Leon felt that he was treated unfairly a few times at work. For example, once when Leon told a story about one of his friends, McKeague joked, "Tony, you have friends?" Leon felt funny and awkward. After that, Leon felt singled out. Leon was required to park his forklift by his aisle, while Hugo Gil ("Gil") (the supervisor of the night shift) and Dave (whose last name and position are not included in the record) were allowed to park their forklifts near the exit. In addition, Leon was required to have his aisles checked by a supervisor before he could leave while Gil and Dave were allowed to leave without having their aisles checked. Having his aisle checked and parking his forklift sometimes took less than one minute. Leon, who was paid by the hour, was paid for the time it took him to park his forklift and have his aisle checked. In addition, Leon told Troy Adams that he felt that McKeague was riding him. Separately, Leon was once named a temporary lead for his shift, but no one told the crew that Leon was the temporary lead. Leon was also once threatened by an Hispanic material handler.

On April 3, 2007, Leon was involved in a dispute (the details of which are not in the record) with McKeague. McKeague signed a written warning (an "Employee Corrective Session Record" in Jacobson parlance) stating that Leon had become insubordinate during the dispute. After the dispute, Leon complained about the dispute to Gilbert Cruikshank, a black employee who supervised the first shift. When McKeague issued Leon the written warning during a meeting on April 4, 2007, it was Cruikshank, not McKeague, who physically handed the

document to Leon. Leon did not think there was any reason for Cruikshank, the day-shift supervisor, to be in the room when Leon was meeting with his supervisors.

Leon complained to Jacobson about the April 3, 2007 incident. Specifically, on April 4, 2007, Leon drafted a complaint letter that he gave to Patty Eberle, the Assistant Operations Manager. In the letter, Leon stated that the April 3, 2007 incident was not his fault and that he should not have been disciplined. Leon asserted that he was subjected to "unfair treatment" and "harassment" by McKeague. Leon's letter did not, however, contain any reference to race or color or any suggestion that race or color played a role in his dispute.

A few weeks later, Jacobson's General Manager met with Leon and the rest of the night-shift staff. The General Manager asked everyone to put the past behind them and work cooperatively. Leon agreed.

On May 16, 2007, Leon was again accused of insubordination. Shortly after the start of the night shift, Leon approached Gil, his supervisor, about his pick sheets. Leon believed he did not have enough time on his shift to complete all of the work on the pick sheets assigned to him. Gil accommodated Leon's concern by taking some of the pick sheets away from Leon. Leon approached Gil again later during the same shift. Leon was again concerned that he would not be able to complete the remaining pick sheets during his shift.

A short time later, Gil called a group meeting of the night shift staff. Gil spoke (although what he said is not in the record). Another employee, Phillip Jacobson, said something to the effect of "yeah, we're supposed to do our work and not supposed to complain." Gil began to speak again. While Gil was speaking, Leon raised his hand. This is how Leon (at his deposition) described the meeting:

> I raised my hand. Before I even opened my mouth, I raised my hand, and [Gil] said, I'm not finished. And he just kept ranting on. And I felt really belittled at that point like, okay, I know–in mind I'm saying, I know that this has something to do with the meeting that him and I had before. I'm being put on notice, I'm being singled out here.
>
> So then I said I need to speak right now. And then he said, I'm not finished. I said if I'm not able to speak right now, I'm going to leave. So then he said, Tony, leave.
>
> And as soon as he said leave, I said I'm going to say this anyway. I said, it seemed like what you're talking about right now was about the conversation you and I had earlier and I feel like you singling me out, like that. I got up.

(Leon Dep. at 109-110).

Leon left the meeting and started walking toward his forklift. Gil followed in order to obtain the pick sheets that Leon had not completed. Leon said to Gil something like "it's best you probably step back because of what just happened." The exchange was "heated." Leon handed his pick sheets to another employee and was escorted out of the building.

The following day, Gil reported the incident to Operations Manager Troy Adams and Assistant Operations Manager Patty Eberle ("Eberle"), both of whom worked the day shift. The morning of May 17, 2007, Eberle conducted an investigation, interviewing witnesses and reviewing statements from witnesses Phil Jacobson and Gil. Eberle and Adams then discussed the May 16, 2007 incident and decided to terminate Leon's employment due to insubordination and his confrontation with his supervisor. They conferred with someone in human resources.

In the meantime, Leon was making a written record of his own. When he woke up on the morning of May 17, 2007, Leon drafted two complaint letters about the incident the night before. In the two letters, Leon complained that he was treated "unfairly" and "with prejudice." Neither complaint letter referenced race or suggested that color played any role in his dispute. Leon

-5-

emailed the letters to Anne Louison (who worked in human resources in Jacobson's Des Moines, Iowa facility) at 10:23 a.m. Later, Leon received an email from Louison, who told Leon she could not open his attachment. Leon then had his wife send the complaints to Louison by facsimile. Neither Eberle nor Adams knew about the May 17 complaint letters until after Leon's termination.

When it was time for his shift to start on May 17, Leon arrived at the Jacobson warehouse and punched in. Eberle, Gil and McKeague met with Leon to inform him that his employment was terminated. Leon turned in his employee badge and was escorted from the building.

On November 16, 2007, Leon filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). After the EEOC issued a notice of right to sue, Leon filed this suit on August 5, 2011. In his complaint, Leon alleges that Jacobson discriminated against him on the basis of race when it treated other employees more favorably, failed to stop harassment and terminated his employment. Leon also alleges that Jacobson retaliated against him for exercising his rights under Title VII.

Jacobson moves for summary judgment.

## II. <u>Summary Judgment Standard</u>

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

### III. Discussion

#### A. Leon's disparate treatment claims

The Court first considers Leon's claims that he was discriminated against on the basis of his race. Pursuant to Title VII of the Civil Rights Act of 1964, it "shall be an unlawful employment practice for an employer–(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *See* 42 U.S.C. § 2000e-2(a). Leon also brings his discrimination claim under 42 U.S.C. § 1981, which grants all persons "the same right in every State and Territory to make and enforce contracts" as "is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 goes on to define the term "make and enforce contracts" to include "the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

In this case, Leon asserts that Jacobson discriminated against him on two occasions: (1) in 2004, when he was transferred from the day shift to the night shift; and (2) on May 17, 2007, when his employment was terminated.

Jacobson argues that Leon's claim with respect to the transfer is time-barred. The Court agrees. To recover for the 2004 transfer, Leon must have filed a charge of discrimination within

300 days thereafter, which he did not do. *National RR Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) ("A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it."). Thus, Leon's Title VII claim with respect to the transfer is time-barred. Leon's § 1981 claim arising out of the transfer is also time-barred by the four-year statute of limitations applicable to claims under § 1981(b). *Jones v. RR Donnelley & Sons Co.*, 541 U.S. 369, 382-384 (2004). Accordingly, Jacobson is entitled to judgment as a matter of law on Leon's disparate treatment claims arising out of the 2004 transfer.

Next, Leon asserts that Jacobson discriminated against him on the basis of his race when it terminated his employment on May 17, 2007. A plaintiff may establish discrimination in violation of Title VII either by putting forth direct evidence of discrimination or by following the indirect method under *McDonnell Douglas Corp. v. Green.*, 411 U.S. 792, 802 (1973). Under the direct method, "the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Leon argues that the following incidents constitutes evidence that he was terminated on the basis of his race: (1) that in 2004, Dallas pulled out a knife in front of Leon; (2) that, in 2004, when Leon stated that he was an African-American, Dallas stated that Leon was an American; and (3) that, in 2004, Adams called Leon an asshole. None of these events suggests that Leon's employment was terminated due to discriminatory animus. The first two events not only took place years before the termination, but they also involved Dallas, a former day-shift supervisor who had no involvement in the events leading up to Leon's termination or in Jacobson's decision to terminate Leon. The third incident involved one of the individuals who decided that Leon's employment should be terminated, but the fact that the decision-maker called Leon an "asshole"

three years before his termination in no way suggests that Leon was terminated due to his race. Accordingly, the Court concludes that Leon has not put forth sufficient evidence of discrimination using the direct method.

The Court, then, turns to the indirect method of establishing discrimination. To make out a *prima facie* case of discrimination in the termination context, a plaintiff must establish that (1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he was discharged; and (4) the employer either filled the position with a person not in the plaintiff's protected class or similarly-situated individuals outside his protected class were treated more favorably. *Jennings v. Illinois Dep't of Corrections*, 496 F.3d 764, 767 (7th Cir. 2007); *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 845-846 (7th Cir. 2007). The "burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). It requires a plaintiff to show that he was "rejected under circumstances which give rise to an inference of unlawful discrimination" and the "standard is not inflexible" because facts vary in different cases. *Burdine*, 450 U.S. at 253 and n.6. In this case, the Court assumes, without deciding, that plaintiff could make out a *prima facie* case of disparate treatment.

If the plaintiff makes out a *prima facie* case of discrimination, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decision." *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 724 (7th Cir. 2005). "If the employer does articulate such a reason, then 'the plaintiff must show by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination.'" *Rudin*, 420 F.3d at 724.

The Court concludes that Jacobson has articulated a legitimate, non-discriminatory reason for terminating Leon's employment. Jacobson has put forth evidence that Leon's

employment was terminated due to insubordination and his confrontation with his supervisor Gil the evening before.

To defeat summary judgment, Leon must put forth sufficient evidence from which a reasonable jury could conclude that the proffered reason was a pretext for race discrimination. A pretext is a dishonest explanation, rather than an error. *See Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009). To show pretext, Leon "must establish that the explanation is a lie, which permits a jury to infer that the tale has been concocted to conceal an unlawful truth. It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused, or otherwise benighted; none of those possibilities violates federal law. Poor personnel management receives its comeuppance in the market rather than the courts." *Yindee v. CCH Inc.*, 458 F.3d 599, 602 (7th Cir. 2006) (internal citations omitted).

In this case, Leon has not put forth any evidence of pretext. To the contrary, it is clear from Leon's own testimony that the explanation for Leon's discharge was not a lie. Leon, himself, testified that when Gil told Leon he was not finished speaking, Leon said, "[I]f I'm not able to speak right now, I'm going to leave." When Gil responded that Leon should leave, Leon said, "I'm going to say this anyway." Later, when Gil approached Leon to collect Leon's remaining pick sheets, Leon said to Gil something like, "it's best you probably step back because of what just happened." So, Leon's own testimony confirms that he was, in fact, insubordinate, which means Jacobson's explanation was not a lie. Furthermore, the undisputed facts are that Eberle, the decision-maker, interviewed witnesses, read witness statements and actually believed that Leon had been insubordinate. In short, Leon has put forth no evidence from which a reasonable jury could conclude that Jacobson's explanation for the termination of Leon's employment was a pretext for race discrimination. Jacobson is entitled to judgment as a matter of law on Leon's disparate treatment claims.

Accordingly, the Court grants Jacobson summary judgment on Leon's disparate treatment claims.

### B. Leon's retaliation claim

Leon next asserts that Jacobson retaliated against him by terminating his employment after he made complaints on April 4, 2007 and on May 17, 2007.

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Leon may support his retaliation claim using either the direct or indirect method of proof. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008). To establish retaliation using the direct method, Leon must put forth evidence that he engaged in statutorily protected conduct, that he was subjected to an adverse employment action and a causal connection between the two. *Gates*, 513 F.3d at 686. Evidence of a causal link is evidence that the "protected conduct was a substantial or motivating factor in the employer's decision." *Gates*, 513 F.3d at 686. To make out a *prima facie* case of retaliation under the indirect method, Leon must demonstrate, "that after engaging in protected activity such as filing a charge, [he] was subjected to an adverse employment action even though [he] was performing [his] job satisfactorily, and no similarly situated employee who did not file a charge was subjected to the adverse employment action." *Mannie v. Potter*, 394 F.3d 977, 984 (7th Cir. 2005).

Each method of proof requires evidence that the employee engaged in protected conduct, and this is where Leon's claim fails. Here, Leon complained generally that he was harassed and treated unfairly, but he never complained that the treatment was based on his race. General

complaints of unfairness are not protected conduct. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Although filing an official complaint with a employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected claim. Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.") (internal citation omitted). In his complaints, Leon never mentions race or any facts that raise the inference that race discrimination is what he is complaining about. Thus, Leon has failed to put forth sufficient facts from which a reasonable jury could conclude that he engaged in protected conduct. For this reason, Jacobson is entitled to summary judgment on Leon's retaliation claim.

### C. Leon's race harassment claims

Finally, Leon claims that he was subjected to a hostile work environment. Jacobson is liable for creating a hostile work environment if Leon can show: "that [his] work environment was both objectively and subjectively offensive; (2) that the harassment was based on [his] race; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). In considering whether the environment is hostile, a court is to consider the "totality of the circumstances[,]" including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)). In addition, to "qualify

as a hostile work environment, the conduct at issue must be severe or pervasive enough to cause psychological injury." *Ellis*, 650 F.3d at 647.

Leon points to six incidents that he argues add up to a hostile environment. First, once in 2004, Leon's supervisor, Dallas, pulled out a knife. Second, also in 2004, when Leon referred to himself as an African-American, Dallas told Leon that Leon was an American. Third, in 2004, after Leon had worked for Jacobson for about a year, Leon transferred to the night shift. Fourth and fifth, Leon was required to have his aisle checked by a supervisor before he could leave and to park his forklift by his aisle instead of the front door. Sixth, Leon was once made a temporary lead (while a supervisor was on vacation) on his shift, but the rest of the workers on the shift were not told.

Considered in their totality, these events do not constitute a hostile environment based on Leon's race. They are neither severe nor pervasive. The biggest problem with Leon's claim, though, is that five of the six incidents have no connection to race. The only incident that has any connection to Leon's race is Dallas's 2004 statement that Leon was an American, in response to Leon's statement that he was African-American. Calling someone an American is not objectively offensive.

Leon has not put forth sufficient evidence from which a jury could conclude that he was subjected to a hostile environment based on his race, and Jacobson is entitled to judgment as a matter of law on his harassment claim. Thus, the Court grants Jacobson's motion for summary judgment as to Leon's race harassment claim.

### IV.	Conclusion

For the reasons set forth above, the Court grants defendant's motion for summary judgment. Case closed.

ENTER:

George M. Marovich
United States District Judge

DATED: April 11, 2012